**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT  84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| BJORN JONES, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF UTAH, | : | Civil No. |
| | : | |
| Defendant. | : | Hon. |

COMES NOW the Plaintiff, Bjorn Jones (hereinafter referred to as "Mr. Jones" or "Plaintiff") complains of Defendant University of Utah (hereinafter referred to as the "University of Utah" or "Defendant"), demands trial by jury and as and for causes of action alleges as follows:

### JURISDICTION

1.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, for discrimination in employment and for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000 e (5).

Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g).

Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq.

Where employment discrimination based upon disability is alleged, jurisdiction is

conferred by the Americans with Disabilities Act ("ADA") and/or the Vocational

Rehabilitation Act of 1973 ("Rehabilitation Act").

## PARTIES

2.      Bjorn Jones is a citizen of the United States and a resident of the

State of Utah.

3.      The University of Utah is a political subdivision of the State of

Utah which does business in the State of Utah in Salt Lake County and which is an

"employer" subject to the terms and provisions of the ADA and/or Rehabilitation Act.

## STATEMENT OF FACTS

4.      Mr. Jones has a rheumatological impairment called (1) Ankylosing

Spondylitis (AS), which is an autoimmune disorder similar to Rheumatoid Arthritis in

that it attacks the body and the joints, causing widespread inflammation and pain.  A

unique characteristic of AS is that the pelvis and the tail bone joints (sacroiliac) fill in

with bone, causing increased pain and inflexibility.  Another relevant impairment Mr.

Jones has is (2) Fibromyalgia, which causes nerve pain throughout the body, on top of

the inflammation that is caused by the AS.  Furthermore, he has a disability that

2

involves a childhood hip deformity, Legg-Perthes, that caused a childhood of pain and limping, which culminated in his hip collapsing at age 23, requiring a total hip replacement. Each of these impairments alone substantially limits major life activities, but with all three, symptoms are complex and compounding.

5. Mr. Jones' impairments and consequential pain substantially limit his major activities of daily life, such as when buttoning buttons, putting on his belt, tying his shoes, also holding his wife's hand, and carrying his young children. Turning a doorknob or holding things in his fingers for longer periods of time can increase pain. It is painful to bend down and over to one side or the other. Walking, jogging, and running cause much pain for his joints, particularly his ankles, knees, and lower back. Turning his head from one side or the other is painful. In most places, he cannot sit for five minutes without having a lasting impact on his spine for hours. It is painful to reach out, or reach down with his arms. If he is sitting and his arms aren't being supported correctly, it puts terrible strains on his shoulders and neck, which can turn into migraines. Therefore, if his arms aren't supported in the appropriate way while he is typing or using a mouse for an extended period of time, this creates substantial pain, which causes him to lose concentration, and makes his arms, hands, and fingers become inflamed and harder to use. He has had to take sleep medicine for over five years because his pain has been so severe that he has insomnia.

3

6.     Mr. Jones uses medications, a specialized ergnomic chair, known as an Amia Steelcase chair, and techniques and practices to limit the pain he experiences.  His primary medications include Humira, Lyrica, Butrans, Trazadone, Ibuprofen, and Acetaminophen.

7.     All three impairments are expected to last for the rest of his life, including the stiffness, pain, and rigidity of his totally replaced right hip.

8.     Mr. Jones' limitations affect his ability to perform the job at issue in this civil action by requiring him to use a Amia Steelcase ergonomic chair to maximize the support given to his spine and limbs.  The desk at his job was unusually short to begin with, but then to factor in that he is 6'2'' with long arms, and have all the inflammation and pain that he does, typing and using the mouse for extended periods of time was immensely painful, essentially, as if he were reaching and putting strain on his shoulders and neck constantly.  To work day after day, and week after week, without accommodation, was painful for him to perform his job and affected his physical mobility due to the inflammation caused by having to physically fully extend his arms without the appropriate support.

9.     On February 21, 2017, Mr. Jones began employment at the University of Utah, Department of Pediatrics, performing the job of Pediatric Specialty Scheduler.  Mr. Jones' job duties included answering phone calls using a headset and

4

providing patients and parents of pediatric patients exceptional customer service

regarding their health care, helping them schedule and cancel appointments, along with

explaining what to expect upon arrival.  This was done while navigating several

computer programs.  It also included working with the physicians' offices regarding

pre-authorizations and follow-up care for patients and calling the patient or patient

representative to be pro-active about their health care.  It also involved organizing and

updating patient appointment and procedure records.

       10.     Mr. Jones was capable of performing all of the major functions

and parts of his job with a reasonable accommodation.  It is just the length of time and

the efficiency that he can perform the major functions, which are affected by being

without the reasonable accommodations.

       11.     Mr. Jones made the University of Utah made aware of his

limitations and disabilities on the third day of his employment, February 24, 2017.

Following the protocol that was given to Mr. Jones by the Human Resource

department, Mr. Jones submitted the employer's Disability Accommodation Form, and

submitted it by fax to the number on the form, to the Office of Equal Opportunity and

Affirmative Action (OEO).  He submitted a document entitled "Exhibit CC - Original

Accommodation Request Form".  The file shows the date and time stamp of when the

previously mentioned office received that form, which was February 24, 2017, at 4:07 p.m., Mountain Standard Time.

12.      On March 2, 2017, Ms. Liz Prince ("Prince") of the OEO Office emailed Mr. Jones to inform him that she had received his Disability Accommodation Form and she generally explained the process of accommodation requests.

13.      Thus, on February 24, 2017, Mr. Jones sent a Disability Accommodation Request to the University of Utah's Office of Equal Opportunity and Affirmative Action.  In such request, he explained that he had a condition known as Ankylosing Spondylitis.  Ankylosing Spondylitis is an autoimmune disease similar to Rheumatoid Arthritis in that it causes chronic inflammation and deterioration of the body's joints, but it differs from Rheumatoid Arthritis because certain joints of the body become filled in with bone and fuse together — namely, the lower spine, which is one of the symptoms which Mr. Jones experiences.  His submission contained two accommodation requests, one pertained to elevating his work station twelve inches from its current level, and the other was a request for a specific type of ergonomic office chair.

14.      From day one of Mr. Jones' employment, he had brought his personal "Amia Steelcase" chair to leave at work until the hopeful day when a chair would be provided for him through a reasonable accommodation.  He requested an

Amia Steelcase chair just like the one he had brought to work and kept in the back of his van so that, when he and his wife took their children to see their grandparents, he could have a comfortable place to sit, or to church, or to the movies.  For a whole month, Mr. Jones made sacrifices of either being in extra, immense pain, or missing out on life opportunities, in order to be able to have his chair at work so he could be productive and benefit his employer.

       15.    On March 2, 2017, Liz Prince (hereinafter referred to as "Prince"), Equal Opportunity Consultant, contacted Mr. Jones and the two of them engaged in an email conversation.  She stated specifically in regard to the request for an ergonomic chair, that she would "reach out to [Mr. Jones'] supervisor to determine if it is reasonable for them to make the purchase", and also that, because it was "more expensive than most," she would "likely be going through the medical information evaluation process in which medical documentation will be required to be submitted by [Mr. Jones'] medical provider detailing [his] condition and need for this specific chair".  Mr. Jones explained to her that, for the time being, he was using his personal chair of the same model that he had requested to use as an accommodation, but that he needed the chair he had brought from his home for personal use at home as well and transporting the chair to and from his home and in and out of his car was quite painful for him.

16.     Prince also stated the elevated work station was a possibility and that it would be discussed with his supervisor.  She made no mention that the request for an elevated work platform might or would require medical documentation.  Thus, Mr. Jones presumed that the process to implement such request for accommodation for his disability would continue without any further action on his part, and he was determined to do his best to be patient, even if it meant enduring pain unnecessarily and not being as productive as he could have been, had the University implemented the requested accommodation to elevate his work platform in a timely manner.

17.     Although Prince had told Mr. Jones that the University would most likely be going through a medical information process with a request for information from his doctor, she did not (1) inform him that the medical information process was to be definitively initiated; (2) inform him that she had sent a questionnaire to Dr. Darley's office; and (3) did not notify him that March 16, 2017 was the deadline to have the medical questionnaire returned so that his accommodation request could be properly evaluated.  Mr. Jones alleges all three of these reasons are important because he has found that medical processes and accommodation processes move much quicker when the patient is an active participant, *i.e.*: (1) if he is not told that the medical information is proceeding, then he cannot know when, if, or what he needs to do to get and keep that process moving; (2) if he is not informed that the

questionnaire was sent to Dr. Darley's office, then he cannot know that he should be looking to follow up with Dr. Darley's office, instead of merely waiting to hear an update from Prince; and (3) if he is not notified that March 16, 2017 is the deadline to have the completed medical questionnaire returned, then he is unable to be proactive in ensuring that his disability accommodations request is not delayed by missing any deadlines.

18.   Mr. Jones alleges he had a need and the right to be informed about any action or inaction taken with regard to his requests for disability accommodations. This is why he was surprised and disappointed.  Fortunately for Mr. Jones in this situation, Dr. Darley's office was fairly quick to update him on where the parties were in the process so that Mr. Jones could make an appointment to see Dr. Darley and discuss the requested accommodations.

19.   On March 6, 2017, a few days after Mr. Jones' conversation with Prince, he received a call from his Rheumatologist, Dr. Michael Darley, who was treating him for his condition of Ankylosing Spondylitis.  Mr. Jones was able to reserve the soonest available appointment, March 16, 2017.  Dr. Darley's appointment scheduler told Mr. Jones that March 16, 2017 was also the deadline that was listed on the letter from his employer's Disability Accommodations office to his doctor, which asked that a medical questionnaire be completed and returned, to assist in evaluating

his accommodations request for an ergonomic chair.  Mr. Jones found it surprising and disappointing that he had received this information through a phone call from his doctor, because Prince had told him twice in the email conversation of March 2, 2017 that she would keep him "updated as we move[d] along".

20.      The Director of the Office of Equal Opportunity and Affirmative Action has informed Mr. Jones that Prince never contacted his supervisor, Anne Laveder (hereinafter referred to as "Laveder"), Manager, Administration, about the accommodation request until March 16, 2017.  Therefore, after two weeks of Mr. Jones experiencing increasing pain at work due to needing his work desk to be adjusted twelve inches higher, Prince hadn't even contacted his supervisor about the request, even though the email chain proves Prince was fully aware of the situation. This means that a whole 24 days passed before the accommodation request he had submitted was even discussed with his supervisor who could put in the request to have his desk level elevated.  Then, on Monday, March 20, 2017, Mr. Jones' supervisor sent a work chat to him stating that she had approved and submitted a request for his desk to be raised.

21.      After Mr. Jones had scheduled the disability accommodations appointment with Dr. Darley's office, he looked at his team's calendar, as was the established protocol, to see if anyone on the team had scheduled to be off that day.  Mr.

Jones saw that someone had that whole week off, but because the soonest available appointment with Dr. Darley was March 16, 2017, and the deadline to have the questionnaire completed and returned was March 16, 2017, he truly had no other option, but to request time off to attend such doctor's appointment.  He then submitted, via email, a "time off request" in order to be excused from work the day of his appointment.  The email specifically stated the appointment was to visit with a doctor in regard to his disability accommodation request.  In the email, he also mentioned that he set an appointment with an Allergy Specialist (Dr. Aaron Kobernick) to check for allergens in the workplace, because he was experiencing "adverse reactions," which was a reference to his increased asthmatic symptoms.  (Dr. Kobernick's testing came back negative.)

        22.     Mr. Jones' team lead, Starlene (Star) Todd (hereinafter referred to as "Todd"), Pediatric Scheduling Lead, responded to his time off request email by saying that she approved the request, but also that another team member had already scheduled the time off, and she finished by stating "but since you are relatively new[,] I feel comfortable allowing you the time off.  Going forward, make sure that you review the calendar to see if anyone on Red Team has already requested the day".  Mr. Jones' head supervisor, Laveder, Manager, Administration, was also a recipient of this email chain.

23.    Mr. Jones felt as if he was being treated as though they thought they were doing him an extra special favor by granting him the time off.  However, the only reason he was requesting time off was so that his disability accommodation request could be fulfilled and he could be a more productive employee, and not have to endure as much pain as he had been enduring.

24.    Mr. Jones alleges he was in constant agony each day that he was working.  The pain resonated from the tips of his fingers all the way up to his neck, and through his jaw, ears, and temples.  This always occurred on both sides of his body.

25.    There were a couple days when Mr. Jones was not able to work at all and had to return home early from work because he was feeling especially terrible because of pain.  Although he had the pain as previously described every day, on Friday, March 3, 2017, it raised to a new level and became wholly unbearable.  What was unique was that his arms and neck began to feel so heavy, as if they were filled with concrete, in a way, which virtually paralyzed him at his workstation.  Mr. Jones alleges his movements became slothful-like and the flexibility in his arms and neck was minimal.  The pain went beyond his jaw, ears, and temples, to his eyes.  When he extended his arms toward the keyboard, he could not focus on the items displayed on his computer screen because his eyes kept rolling upward.  After attempting to endure a solid hour of this, he felt excessively terrible physically, but also, as his work

production was largely diminished as a result of the pain, he did not believe that

staying at work was a moral choice because he felt that he was not contributing enough

to the productivity of his employer so as to earn his wage in a manner of integrity. His

team lead was not present that day, so Mr. Jones approached Vanessa Hilleboe

(hereinafter referred to as "Hilleboe"), Quality Assurance Analyst, who also serves in a

managerial role for the office, and he explained that he was not feeling well and that he

needed to leave for the day. Although it was still considered unexcused because it was

a same day occurrence, she approved the dismissal for the day. The next Monday, Mr.

Jones' symptoms returned to their technically functional, but diminished capacity and

abundantly painful state.

26.     On February 8, 2017, Mr. Jones interviewed for his employment

position, and on February 9, 2017, he accepted it. Prior to the interview and after Mr.

Jones had arrived for his interview, which was in the same building and office where

he would be working as a Pediatric Specialty Scheduler, he realized he needed to use

the restroom. He began walking towards the restroom and noticed that, on the floor,

there was an area of about two feet by two feet where pieces of tile were either clearly

loose or completely missing. As he walked about a foot to the side of the loose tiles in

an attempt to escape the mess, he felt his left foot move and shift. He remembers this

because he was very grateful that he had not slipped and fallen right before his

interview.  On his start date, near two full weeks later, on February 21, 2017, when he

saw the floor, he saw that an even greater area of the floor had loose tile.

27.    Although Mr. Jones does not have record of the exact date, some

time after his start date, a tradesman came and removed all the evidently loose tiles,

and also cleared away an even larger amount of tiles.  However, one of his tools was

very loud, and it could be heard in the office off and on for a good couple of hours.

When Mr. Jones left that day, he observed the large bare space, slightly lower than the

tiled floor that surrounded it.  Mr. Jones reasoned that the tradesman would be back the

next day to fill in the floor, as it was obviously a safety hazard.  Surprisingly, the

tradesman did not return the next day, nor the next, and nor the following day.

Eventually someone placed a "wet floor" sign near it and it just seemed to become part

of the scenery.

28.    An alarming thing about the exposed and unfinished floor is that,

although someone from the office where Mr. Jones worked could technically reach the

restroom without walking through it by taking a longer way to get to it, other people

who enter the building could not.  The office shares the building level with a child

daycare facility.  Therefore, if a parent or guardian needed to visit the restroom prior to

picking up a child, they would necessarily have to walk through the unfinished area, as

Mr. Jones had to on the day of his job interview.  Furthermore, if one were to pick up

14

their child from daycare and then it occurred to them that they or their child needed to

use the facilities, they would have to go through the unfinished, unsafe, walkway as

well. But also, for all those in the office where Mr. Jones was employed, the unfinished

floor presents another problem, because that part of the floor lies between the outside

door of the building, and the door that leads to the part of the office where people need

to swipe their ID badges to clock in and out for their shifts.  This setup essentially

makes the area with the exposed floor a much-traveled area.  Even though people walk

through it the great majority of the time with no complications, it can present some

severe challenges and hazards for some, both for individuals with and without

disabilities.

> 29.    Mr. Jones alleges his disability, Ankylosing Spondylitis, is one of

the disabilities where a clear and completely level walking space is imperative to

minimize the risk of injury.  Because his sacroiliac joints have fused together, or in

other words, both sides of his pelvis are fused with his tailbone, most minor mishaps

can lead to significant pain, and even sometimes to severe injury.  This is because: (1)

his bones aren't flexible; and (2) when his bones have to absorb impact with little or no

help from a joint, it is typically quite painful.

> 30.    Mr. Jones alleges that, on March 15, 2017, the unfinished floor

not being level with the rest of the floor contributed to an incident.  In the early or

mid-morning of March 15, 2017, he was walking in the hallway where the unfinished

floor was, and, as he was attempting to step over the ledge with his left foot, trying to

get past the space with the unfinished floor, his foot tripped on the ledge, which caused

him to bring his right leg forward abruptly and awkwardly.  He then felt a sudden and

strong pain in his right hip and lower back.  He didn't believe it was broken, but he

was in a massive amount of pain.  Mr. Jones' sacroiliac joints are little or non-existent,

and so suddenly having to speedily bring his right leg to the ground made his hip and

lower back have to absorb the force of the impact, which was why he was in so much

pain. He then proceeded to return to his desk to work, despite the pain he was feeling.

       31.    Mr. Jones didn't want to tell anyone about what happened because

the ledge seemed so small and insignificant and he didn't want to seem clumsy.  On the

outside, Mr. Jones looks like a young, able-bodied man and Mr. Jones didn't want

anyone to think he was overreacting.  Mr. Jones did his best to  keep working, but soon

the muscles of his hip and lower back were contracting, and in time, his complete

lower back and lower abdominal muscles were clenched.  Mr. Jones believes that is

why he had to leave his desk swiftly twice that morning because he needed to have an

urgent, spontaneous bowel movement.  The tension of the muscles just kept moving

upwards, and at about 11:30 a.m., his chest began to tighten and his breathing became

strenuous, and he began having an asthmatic episode.  To be clear, it was not a

life-threatening asthma attack, because Mr. Jones had never had one, but it was one that severely lessened his ability to think critically, which hampered his ability to do his job.

32.     Because Mr. Jones was experiencing so much pain in the various parts of his body, Mr. Jones knew he needed to go home and attempt to relax his body. In the email request to leave early, which he sent to his Team Lead, Todd, and then forwarded to the informal mid-level Manager, Hilleboe, Mr. Jones explained that he was having asthmatic symptoms and that he had forgotten his acute response inhaler at home.  While these things were true, they were not the ultimate cause of his troubles of the day; but the tripping incident with the unfinished floor actually was.

33.     The next day, March 16, 2017, was the day Mr. Jones had his appointment with Dr. Michael Darley, Rheumatologist, to discuss the disability accommodation questionnaire.  At his appointment with Dr. Darley, as the two began to talk, Dr. Darley informed Mr. Jones that he usually has Occupational Therapists complete the questionnaires for disability accommodations, and he referred Mr. Jones to make an appointment with one to complete the questionnaire.  Mr. Jones' appointment with Dr. Darley was at 10:00 a.m. in Provo, UT, and, then, after Mr. Jones drove home from his appointment, it was nearly noon.  At 11:58 a.m., Mr. Jones sent his Equal Opportunity Office contact, Prince, an email updating her about how Dr.

Darley referred him to an Occupational Therapist.  Mr. Jones also requested an

extension for his disability accommodations case and notified her that he had called the

University of Utah's Life Skills Clinic to set up an appointment, but that he was asked

to leave a message.  Prince replied a few minutes later thanking him for updating her,

and stated that "it" (the extension) was "fine."

34.     On Monday, March 20, 2017, Mr. Jones' head supervisor,

Laveder, initiated a Skype Message conversation and let him know that she had

"submitted the request for [his] desk."  Mr. Jones thanked her for that and then asked

her if there was any news about the request for the ergonomic chair.  She replied, "I

think THEY might need more documentation for that one, THEY should be reaching

out to you about that."

35.     Mr. Jones alleges that, after the conversation, there were two

things that really stood out to him.  The first thing about his conversation with Laveder

is that she used the word "They."  This left him confused, because Laveder used the

word "They" to describe the entity that had approved the request to elevate his desk

and would decide about his chair.  However, in his initial discussion with Prince, his

Equal Opportunity Office contact, she said that his "supervisor" would "determine if it

is reasonable for them to make the purchase."  Mr. Jones had presumed that Laveder

had been the one to interview him, the one who made the decision to hire him, the one

who submitted the request to elevate his desk, and the only person who Mr. Jones had

come in contact with that people in his office called their supervisor, was the individual

who was, in fact, his supervisor.  But if Prince says "my supervisor" determines

whether it is reasonable to make the purchase, and Laveder says that "they," who is/are

making the decision to approve his chair request might need more documentation, then

Mr. Jones was uncertain as to who his supervisor was.  It made him frustrated that he

did not know who was the person making the decision regarding his accommodation

request.  The second thing that stood out to him with regard to his conversation with

Laveder via Skype Message, is that the request to elevate his work desk got approved

without medical documentation, and that it got approved when it did.  Although in his

initial email conversation with Prince, she only referred to the chair as needing medical

documentation, Mr. Jones ended up thinking that it did because he didn't think a

disability accommodation request that didn't need medical documentation would take

that long for someone to contact him.  In addition, the letter sent from Prince to Dr.

Darley, his Rheumatologist, which Mr. Jones received when Dr. Darley gave him the

questionnaire papers to take to the Occupational Therapist, specifically mentions that

the questions are to help evaluate whether his request for his "desk to be raised

approximately 12 inches," would "assist him in performing the essential functions of

his job."  However, the request to elevate his work desk was approved without any

medical documentation, which was after a whole seventeen business days of him

working through excruciating, but unnecessary, pain.  This was both confusing and

frustrating.  But there was another thing about the timing of the work desk request

approval that raised a concern for him.  Although the request to elevate his desk did

not need medical documentation, it took about two weeks before Mr. Jones was

notified of approval, and it was only shortly after Mr. Jones had emailed Prince, a full

two weeks after she had begun his case and said she would update him, that Mr. Jones

received notification that his desk request had been approved and submitted.  This

made it seem like his elevated work desk request got lost somewhere, or just

straight-up neglected.  Mr. Jones didn't understand (1) why an employer wouldn't be

sure to be on top of fulfilling a simple disability accommodations request, especially

one without the need for medical documentation, if it meant that the employee would

not be in as much pain and would be more productive.

      36.     On Wednesday, March 23, 2017, Mr. Jones began his workday

not working at his typical office, but at the Primary Children's Eccles Outpatient

Services Building, because Mr. Jones was scheduled to job shadow the Pediatric

Cardiology Medical Assistants (MAs), who, the previous week, had sat with Mr. Jones

and Todd, and learned how to schedule appointments.  Mr. Jones reported at that office

starting at 8:30 a.m., along with his colleague, Ashley Diamond (hereinafter referred to

as "Diamond"), Pediatric Specialty Scheduler.  Because he was entering a new building, Mr. Jones had come prepared with his office chair loaded into his minivan in case he and Diamond were to be sitting for a significant amount of time during the shadowing.  However, he did not take his chair inside at first because Mr. Jones did not want it to be a distraction and Mr. Jones wanted to make sure he was going to need it because Mr. Jones also knew that Medical Assistants' jobs were more active.  As Mr. Jones approached the front receptionist desk, Mr. Jones noticed something immediately.  He noticed that the cheerful service representatives were sitting in the exact same model of office chair that Mr. Jones had requested for his disability accommodation.  Mr. Jones became elated because, right then, Mr. Jones knew that there was a real possibility that he would be able to get the kind of chair he had requested and take the home office chair that he had been using at work and be able to use it at home.  Mr. Jones presumed that the service representatives had medical issues and were being accommodated.   The front desk service representatives were Channing Jackson (hereinafter referred to as "Jackson"), Outpatient Services Specialist, and Olean Moa (hereinafter referred to as "Moa'), Outpatient Services Specialist.  His colleague, Diamond, arrived moments after, and then Erika Hulse (hereinafter referred to as "Hulse"), Medical Assistant, escorted both back to observe the process of taking vital signs of the patients and electrocardiograms.

21

37.     After attending four or five appointments in rapid succession,

Hulse took Mr. Jones and Diamond to the common office room of the Pediatric

Cardiologists and their Medical Assistants, and that's when Mr. Jones saw that there

were about thirty cubicles with computer workstations, and every single one of them

was accompanied by a chair of the exact same model Mr. Jones had requested as a

disability accommodation.  Mr. Jones could not believe that so many people without

disabilities, and who were in the exact same sub-department as Mr. Jones was,

Pediatric Clinical Enterprise, were able to enjoy the comfort of the chairs, when he,

with a clearly legitimate disability, was being forced to wait for medical documentation

in order to be able to receive the same benefit.

38.     Mr. Jones alleges that he and Diamond left the Pediatric

Cardiology medical clinic about 12:30 p.m., and returned to their regular office after

lunch at about 1:15 p.m.  When Mr. Jones arrived, as he sits directly adjacent to his

Team Lead, Todd, Mr. Jones explained to her in a positive tone that, in the medical

office workroom, there were dozens of chairs exactly like the one Mr. Jones was

requesting, and then Mr. Jones finished by saying something similar to, "So, yeah, I'm

excited, we're gonna get one."  This was accompanied with a grin.  She responded

with something similar to, "Oh really?  I had no idea.  I haven't had the chance to go

yet because it's been so busy here."  Then she asked him about how the experience

22

with the patients was, and a minute or two later, they finished up the conversation

because she had to attend a meeting.

39.     Mr. Jones began working diligently, and very quickly the pain

from his fingers to his temples exploded.  Mr. Jones didn't want to be in pain anymore,

and Mr. Jones didn't want to feel like he wasn't contributing his best to his employer.

Mr. Jones needed to work to provide for his family, and, even though the management

was already quite pleased with his job performance, Mr. Jones knew the Pediatric

Cardiology team needed him even more than what Mr. Jones was able to give without

his disability accommodation requests being fulfilled.  This is because, in recent

months, they had fallen a great deal behind on things due to employee turnover, a

division in the medical specialties, and the extensive attention required for the young

cardiology patients.  As a testament to the improvement as a team, Laveder had sent an

email comparing team performance from January and March, and the statistics had

drastically improved.

40.     On top of that, Mr. Jones knew that his individual contributions in

the workplace were being favorably noticed because of complimentary comments, both

verbal and via email.  For example, just the day before, on March 21, 2017, Todd told

him in spoken conversation that his help with training the Medical Assistants on how

to schedule appointments, contributed to the Medical Assistants' positive feedback.  At

that time, a co-worker, Joshua Clayton (hereinafter referred to as "Clayton"), Template

Specialist, was nearby and Todd explained to him that when one of the Medical

Assistants (MA) arrived in the morning to begin the first portion of the training with

her, the MA stated, "I can just smell the suicide in the air in here," and that, by the time

the MA finished the hands-on training portion in the afternoon with Mr. Jones, the MA

had "opened up quite a bit and at least didn't have a frown on her face."  Todd then

forwarded him the email from the Head Manager for the whole Clinical Enterprise

Sub-department, Rebecca Rechenmacher (hereinafter referred to as "Rechenmacher"),

which congratulated the team on the excellent work with training the MAs, stating that

the MAs had "wonderful things to say about [the] program," and that they felt the

training was "structured and informative".  Todd wanted to give Mr. Jones special

recognition for this, so she gave him two raffle tickets, which Mr. Jones gave to

Lindsey Carcamo (hereinafter referred to as "Carcamo"), who put the tickets in the

office raffle bin. Tickets are drawn periodically and the winner receives a unique

privilege, such as an extra-long paid lunch, or still being paid but being able to leave

early on a Friday.

       41.    Mr. Jones alleges that the accommodations Mr. Jones requested

should have been approved without any inquiry for medical documentation, because

(1) his elevated work desk request did get approved without any medical

documentation; and (2) the exact model of chair Mr. Jones was requesting had been made available to over thirty coworkers, whom one could not reasonably say that all of them, or even half of them, suffered from a disability as agonizing as what Mr. Jones experiences on a daily basis.

42.     Mr. Jones alleges that, on the afternoon of Wednesday, March 22, 2017, he had just returned from shadowing the Medical Assistants.  When Mr. Jones began to work at his computer that afternoon, the crushing pain existed from his fingertips all the way of to the temples of his head, he began to think about how nice it would be when he would finally have his desk elevated, and then he began to think that it must be more of a lengthy preparation process if it takes at least two days for someone to come and elevate the desk once a request has been officially submitted, in his case, submitted by Laveder, on or before Monday, March 20, 2017.

43.     Mr. Jones alleges that it was then that, for the first time, Mr. Jones truly looked to see how his workstation was put together.  His cubicle appeared to have typical cubicle walls, and every three feet or so there was a strip of metal signifying where one piece of the wall ended, and the next part of the wall began.  If one did not look closely, then the metal strips looked like they were part of every manufactured cubicle that Mr. Jones had ever seen in his life, including the three previous offices where Mr. Jones had worked.  However, when Mr. Jones looked closer, he found

something that was uniquely different.  Every inch or so on the metal strips, there was a

slit, and these slits were found from six inches above the floor, up all the way until

about six inches before the top of the cubicle.  Mr. Jones reasoned that, surely, they had

to serve some purpose.  So Mr. Jones examined the smaller document-organizing shelf

that was about eight inches above his main workstation table.  He saw that there was a

three-foot long continuous shelf bracket, or shelf holder, that was inserted into the slits

of the metal strips on one side of the cubicle wall, and that about three feet down at the

end of that cubicle wall piece, it was inserted into the slits there as well.  The

document-organizing shelf was then fastened onto the shelf brackets and that is how it

remained stable.  Mr. Jones deduced that his main workstation table was also held up

the same way, with shelf brackets hooked into the slits at the edges of the cubicle wall.

After a quick look under the workstation table, which confirmed that his deduction was

correct, Mr. Jones also saw that the worktable was divided into three sections, each

corresponding to a three-foot section of cubicle wall.  In addition to being held up by

the shelf brackets, the worktable sections were connected to each other by a tiny

two-by-two inch square plate, with a total of four screws.

     44. Mr. Jones alleges that, upon assessing the situation, he determined

it would be extremely easy to raise his workstation, especially because the three-step

process was more simple than any larger product Mr. Jones had ever come across at

Walmart or IKEA, and that the only tool Mr. Jones needed was a basic Phillips

screwdriver.

       45.    Mr. Jones alleges that he did not believe that adjusting the desk by

himself would be in the least bit dangerous because each part was a smaller piece, the

boards were connected with a simple screw-plate, and Mr. Jones had already

familiarized himself with how the shelf brackets worked because he was able to

practice a couple of times with the document-organizing shelf.  This is why Mr. Jones

did not believe raising his workstation by himself would be a safety concern.  Mr.

Jones thought about waiting longer for someone to come and adjust the desk for him,

but then he remembered how Prince, the Equal Opportunity Office contact, stated she

would update him on the process, when she, in fact, never told him that she had sent

the questionnaire to his doctor, or that the deadline to turn in such document was

March 16, 2017.  Mr. Jones thought of how it took nearly three weeks for the request

to elevate his workstation to be approved, even though medical documentation was not

needed to make a determination.

       46.    Lastly, Mr. Jones alleges that he thought of how, on the date of his

interview, February 8, 2017, there was a two-by-two feet area of tile that was broken,

loose, or missing, and how, a whole five weeks later, there was still an unfinished,

dangerous floor out in the common walkway.

47.    Mr. Jones alleges that, based on all these experiences, there was no reason for him to believe that someone would be coming anytime soon to fulfill his disability accommodation request for an elevated work platform, which would relieve him from the severe and constant pain and enable him to be a more productive worker. After researching what adjusting the work platform would entail and finding the process quite simple, and considering the facts stated above, Mr. Jones decided to adjust the workstation by himself.  To adjust the desk, he needed a screwdriver.  Mr. Jones didn't have a toolbox in his car that day, so he began thinking about which co-worker of his would be most likely have one in the car.  Mr. Jones decided to ask the Team Lead for the Yellow Team, Daniel (Dan) Harkness (hereinafter referred to as "Harkness"), Pediatric Specialty Scheduler.  Mr. Jones then walked over to his desk, waited for a break in his conversation with another co-worker and asked, "Hey, Dan, do you maybe have a toolbox or a screwdriver in your car or something?"  He replied, "Yes...Actually, no, I have my wife's car today. What for?"  Mr. Jones responded quite excitedly because Mr. Jones was working towards a way that he wouldn't be in pain anymore,  "It's so I can adjust my desk height.  I requested that it be changed, but I just realized today that it's super easy to do!  You just needs a Phillips (screwdriver) to loosen a couple plate covers connecting the boards, then lift that board section off, and then pull off the shelf brackets and hook them in where you want them."  Dan moved

28

his fingers along the underside of the desk where Mr. Jones told him a screw-plate was, and he said, "Oh yeah, I guess there are, huh?"  Mr. Jones then asked him, "I guess, do you maybe know of anyone else who might have a screwdriver then?"  As it was already nearing 2:30 p.m., Dan replied, "Patience is a virtue my friend, don't worry about it.  Just bring one tomorrow and do it."  Then the co-worker who sat in the cubicle next to Dan, who was conversing with him prior to his questions, Carrie Cetina (hereinafter referred to as "Cetina"), Pediatric Specialty Scheduler, suggested, "Hey, why don't you just go and ask one of the guys upstairs for one (a screwdriver)?"  Mr. Jones answered, "Oh yeah!  That's a great idea! Thanks."  Mr. Jones then went upstairs and asked a tradesman if he could borrow a screwdriver, who willingly let him borrow a screwdriver.

48.    Mr. Jones alleges that this conversation is remarkably important. This is because Mr. Jones explained in detail how to adjust the height of the work desk, how it required a screwdriver, how you had to set the boards down on the floor in order to move the shelf brackets up, and then put it back together.  And, even after Mr. Jones told them all that was involved in the process, both co-workers did not see a problem with it.  However, it's not just that they didn't have any concerns about it, but that they actually made statements which clearly demonstrate encouragement for him to do it.  Harkness told Mr. Jones to "bring a [screwdriver] tomorrow and do it," and

29

Cetina suggested that Mr. Jones go upstairs to get a screwdriver, which, given the context, inherently indicates that she viewed his intent to obtain the tool in order to adjust his workstation in a favorable manner.  Harkness, being the Team Lead for the Yellow Team, is in a position of knowledge, trust, and authority.  In fact, Harkness was one of the two individuals who interviewed Mr. Jones for his former position.  If Harkness, an employee of the office for several years, a Team Lead, and an individual who is trusted enough to select new staff members, did not know, or did not believe that Mr. Jones' adjusting his work desk in the way which Mr. Jones described was considered dangerous, or against office policy, then how was someone who had barely worked there a month, like himself, supposed to know that to do so would be considered dangerous or against office policy?

49.    Mr. Jones alleges that, after borrowing a screwdriver from a tradesman who was working upstairs, he prepared to begin adjusting his desk.  There were three workstation boards, a left, a middle, and a right.  Mr. Jones moved everything that was on the left and middle workstation boards, either to the right board or removed it from his workstation completely.  Mr. Jones then proceeded by loosening the screw-plate that connected the left and middle boards.  The left board was then completely unconnected and Mr. Jones set it down on the floor.  Mr. Jones then maneuvered the shelf brackets that were supporting the left board, and raised them

approximately twelve inches.  Mr. Jones did not set the left board back on the shelf

brackets, as the board would not have been securely fastened.  Mr. Jones then crawled

under the workstation, with his back pressed up against the middle board, and removed

the screw-plate that was in the far deep corner.  Mr. Jones then proceeded to remove

the screw-plate connecting the middle board and the right board.  Mr. Jones did this

because he needed to raise the middle board in order to secure the left board to it.

After that, Mr. Jones laid the middle board down while Mr. Jones adjusted the shelf

brackets and the far deep corner screw-plate to the appropriate height, and then Mr.

Jones gently placed the middle board back to rest on the two shelf brackets and the far

deep corner screw-plate.  Mr. Jones then immediately, but carefully, crawled under the

middle board and screwed the plate and the board together.  This far deep corner

screw-plate also served as a supporting function, like the shelving brackets did.  It was

at this point that his Team Lead, Todd, returned from her meeting.

       50.    Mr. Jones alleges that as Todd came into his view, he could see a

look of concern on her face.  Although worried, she nicely said, "Oh Bjorn, I wish you

would have asked me before doing that.  I'm not really sure we should be doing that."

She paused to think and then still very kindly finished with, "Okay, don't do any more,

let's just leave it how it is, and I'll go talk with Anne about it."

51.    Although Mr. Jones was surprised that she treated his adjusting the workstation by himself as such a big deal, Mr. Jones heeded her word and backed away, standing seven or eight feet from the middle board of the workstation.

52.    Mr. Jones alleges that, after a couple minutes passed, Laveder, his head supervisor, suddenly appeared at his side and abruptly said, "So, we can't be doing this."  He was startled by her physical approach, but by her verbal approach as well.  It was almost like Mr. Jones was in elementary school again and Mr. Jones was being spoken to like a misbehaved child.  His body and mind began to respond as if they were threatened.  Mr. Jones explained to her that he felt the  accommodation request was taking too long to be approved and fulfilled, stressing the fact that he was just hurting too much to keep going without the accommodation of an elevated work platform.  She responded by telling him that he shouldn't be doing the adjustment himself, and that it was a safety hazard which violated OSHA (Occupational Safety and Health Administration) standards.

53.    At that point, Mr. Jones' voice became timid and his jaw began to quiver with anxiety, while he explained that he had just discovered it was so easy to adjust, and so he thought it would be okay to elevate the work platform by himself.  He looked down and away because he needed to think for a little bit, and a few seconds

later, as Mr. Jones turned to the right side of his desk, Todd, Hilleboe, and Laveder, were all facing him.

54.     Although Mr. Jones honestly felt like he was making a reasonable decision by adjusting his workstation by himself so he could be in less pain and be a more productive employee, Mr. Jones became embarrassed because the four of them were standing in the middle of the office, and the three of them were talking to him about safety standards and how the accommodations process takes time.  Mr. Jones didn't get why he wasn't taken into another room to talk to about him adjusting the desk.  In the work  at the office, part of the job was to protect the personal health information of all the patients, and Mr. Jones didn't understand why he wasn't afforded that same respect, because clearly his adjusting the desk had to do with his disability accommodations.

55.     Mr. Jones alleges that, in the moment where he was forbidden to further try to elevate his work platform by himself in the middle of the office with three supervisors standing right near him, he was experiencing embarrassment, fright, anxiety, and pain, to the point that he began to weep and have an asthma attack, also in front of everybody, which made him feel further shame and humiliation.

56.     Mr. Jones alleges that he began to cry, partly because he noticed there were a lot of people looking at him and he became embarrassed.  Mr. Jones also

felt ashamed because he was being reprimanded in front of everybody, by all three of

them, and it was only because Mr. Jones was trying to stick up for himself and his need

for accommodations.  Mr. Jones sincerely wished they could have moved to another

room so he wouldn't be crying in front of all of his co-workers, but if he started to

move away or if he asked to move to a different room, he didn't want it to look like he

was just not strong enough to handle it, and as if he were running away.  Mr. Jones was

embarrassed to stay, and it would've been just as embarrassing to leave.  There were

several places to go where the group could've gone to be in private, because there was

a conference room right by his cubicle, in addition to Laveder's office.  Mr. Jones

wished that they would've been more understanding and sensitive about the situation.

Mr. Jones felt completely vulnerable.

   57. Mr. Jones alleges that, eventually, they moved the conversation a

little ways away from his cubicle and more towards the receptionist area of the office,

but it was still in the main office area and plenty of co-workers and even patients on

the phone calls with his coworkers would have been able to hear or see him.  His

feelings of shame grew, because even though Mr. Jones knew he was severely

disabled, he also knew that many other people just looked at him as weak, mentally or

physically, or both.  This is why Mr. Jones was so embarrassed when he was asked to

stop and there were three managers talking to him in front of everyone, and this is why

Mr. Jones was hurting so much emotionally, that Mr. Jones was still actively crying.

58.    Mr. Jones tried to express himself by saying that he felt like his

needs related to his disability weren't being met like they should have, and he told

them that he knew they cared about him, but that the person who really cares most

about him, is him.  Mr. Jones added that he needed to keep working to provide for his

family, and that the Red Team needed him to stay caught up with appointment and

diagnostic scheduling, and that's why he adjusted the desk once he realized how

simple it was.  He also told them about where the MAs work over at the Cardiology

Clinic, and at their receptionist area, every single workdesk had the exact same chair

that Mr. Jones had requested for an accommodation in order to support his back.  Mr.

Jones explained that he could not understand why there was a whole group of people,

not just in the Department, but within the specific Division, Clinical Enterprise, who,

despite the reasonable likelihood that the great majority did not have a disability, were

able to enjoy the comfort of the chairs, and he, with a severely limiting and terribly

painful disorder, was denied a disability accommodation request upon the grounds that

he needed to submit medical documentation.

59.    Mr. Jones alleges that one of them asked him if he could just use

one of the vacant workstations for the rest of the day, which, to him, was a completely

ridiculous question, since the whole reason why he started to adjust his own

workstation was because he was in so much pain with his workstation so low.  Mr.

Jones explained to them that he really couldn't use another low desk because he would

be in too much pain.  After that, one of them asked him asked whether he would be

able to work at the receptionist's top counter, which was higher than the workstations,

but was only about twelve inches deep, which would mean that there would only be

space for the computer monitor and the keyboard, and then all of his arms would have

had to have been held in the air without any resting place.  Mr. Jones alleges he simply

explained that his arms, neck, and back wouldn't be able to handle that either.  Mr.

Jones thought it would be pretty clear to understand that if he were in pain because his

workstation was too low and his forearms have support, that it would be just as bad, or

even worse, to have a higher workstation with absolutely no support.

      60.    Mr. Jones alleges Vanessa Hilleboe and Laveder then discussed

about who they might talk to in order to request a facilities worker to come and finish

adjusting the workstation.  Interestingly, they even brought up that it might be possible

for him to finish adjusting the workstation, but that they would just have a facilities

worker come by later that night to ensure that his workstation was "structurally stable

and safe."  Todd offered him words of comfort, calmly stating, "It's gonna be okay.

We'll do everything that we can do to get this taken care of.  I had no idea it was that

painful for you, I'm sorry." Through his crying, Mr. Jones thanked Todd. Laveder

then said that she was going to go upstairs and see if one of the tradesmen would be

able to come down and finish it up.

       61.    A couple minutes later, Laveder returned with the news that the

tradesmen upstairs were not University of Utah employees, but rather an independent

company, so they could not come down to finish or inspect the workstation prior to

him working in it again. She then explained, "So it's already almost three o'clock, and

I don't think we're gonna be able to get a facilities worker over here soon enough for

you to work, so why don't you go home, and hopefully it will have gotten done by

tomorrow." Mr. Jones said, "Okay, sounds good," and continued with "and I actually

would really like to go to my parents' house tonight, and I want to take my (personal)

chair home so I can be comfortable there." Laveder then affirmed what Mr. Jones had

said, and then Hilleboe said, "I wonder if we could get a facilities worker to bring over

a chair from that clinic for tomorrow." Mr. Jones alleges he stated he would be willing

to go before work the next day and get one to bring it over, to which Laveder

responded, "No, it's okay, we'll handle it." Mr. Jones then went back to his desk,

grabbed his daily backpack, and wheeled his personal chair all the way out to the car,

leaving for the day at 2:55 p.m.

62.    That night, Mr. Jones did not hear anything from any supervisor and so he assumed he would be going into work the next day, on Thursday, March 23, 2017.  That morning, Mr. Jones arrived to find his work desk just the way he was asked to leave it the day before, and it was apparent that no chair had been brought over from the other building to accommodate his disability.  Hilleboe saw him arriving and walked over to him and said, "So we don't know exactly what's going on with your stuff today, so maybe you could just hang out over there until we get things figured out."  The location of "over there" was one of the vacant cubicles.  The cubicle did not have a comfortable place for him to sit in, and so he went out to his van, rolled in his personal chair, and began to wait as he had been instructed.

63.    After about fifty or so minutes, Todd came over to him and let him know that Laveder wanted to speak with them in her office.  In her office, Laveder stated, "So we really don't know when your stuff is going to be ready, so we don't really see a point for you to have to be here."  Mr. Jones completely understood and he said, like Mr. Jones often does in conversation, "Okay, sounds good."  At this time, Mr. Jones did not make any inquiry as to whether the hours for which he was going were going to be paid or unpaid.  However, it did make sense in his mind that it would be paid, because it was they who had not fulfilled the disability accommodations.

64.     At home, a little later that afternoon, Mr. Jones couldn't remember if he had clocked out for the day or not, so he logged into the timecard program, Kronos.  Mr. Jones alleges that it was there that he saw that for that same day, Thursday, the one where Mr. Jones arrived for an hour and then was asked to leave, that he had received seven hours of "ADMIN LEAVE PAY," in contrast to what he had received before when he left home early, "UNPAID LEAVE UNEXCUSED." Mr. Jones was grateful to Laveder for giving him those paid hours, because it truly was not his fault that he could not work.  Laveder choosing to give him Administrative Leave Pay demonstrates that, at that moment, she believed his inability to work on Thursday was due to a legitimate reason, enough that she would grant him seven full hours of paid time off.

65.     Mr. Jones alleges that, although his shame and embarrassment from being singled out for trying to accommodate himself in order to work with his disability, was still there from the day before, he left on Thursday feeling like his disability situation was finally being understood and that he was going to have the opportunity to work with substantially less pain.  He soon found out that both of those things were not going to happen.

66.     Mr. Jones alleges that later that same day, on Thursday March 23, 2017, at about 6:00 p.m., he received an email from Nick Snow (hereinafter referred to

as "Snow"), Peds HR Operations Manager, stating that Mr. Jones had been "Released from Employment."  Snow then listed a reason for his termination, stating: "This release from probationary employment is based on your unauthorized dismantling of your work desk, which rendered your work area unusable, in addition to your disruptive behavior when asked to stop.  You have demonstrated behavior that is not consistent with the PROMISE Standards.  This type of behavior will not be tolerated." The termination of employment email also advised that Mr. Jones that he should speak with his supervisor, Laveder, about coming to retrieve his personal items and return his ID badge.

67.     Mr. Jones alleges that, on Friday afternoon, with Laveder's approval, he gathered his things, and then returned his ID badge.  He noticed two things that didn't surprise him, but are worth mentioning, (1) his workstation, the one that was allegedly so dangerous because Mr. Jones had "dismantled" it, was still dismantled, exactly the way he left it; and (2) the unfinished floor, the one that had been damaged and posed a serious safety hazard since at least the date of his job interview six weeks prior, was still there, unfinished as always.

68.     The day after Mr. Jones received notice of his firing through email, he went in and spoke to the Equal Opportunity Director, Sherrie Hayashi (hereinafter referred to as "Hayashi"), and she stated with regards to adjusting the

height of workstations for disability accommodations, "We can do those REALLY fast." Mr. Jones even has this on tape.

69.    If the University of Utah claims that his crying was "disruptive behavior", Mr. Jones alleges that other employees, including many managers, speak boisterously across the room to each other, the loud machines of the tradesmen who came to work on the tile floor, and he mentions the weeks-long construction of the floor directly above the Pediatric Patient Scheduling Office, which included extended length jackhammer noises, loud sounds like gunshots, etc.

70.    Mr. Jones alleges that the University's decision to terminate his employment caused him to lose wages and benefits, damaged his employability, and exacerbated his impairments. Mr. Jones will refer to these circumstances as his mistreatment, however, technically, his mistreatment began to occur well before that when his disability accommodation request was disregarded. His physical and emotional symptoms were/are:

       a.    For about three weeks after his employer's decision to terminate his implement, Mr. Jones had to deal with persistent physical and mental feelings of anxiety. Although Mr. Jones have periodic anxiety issues before, those have been limited to the stomach and lungs, where much of the

problem could come from asthma.  However, the anxiety issues after his

employer's mistreatment of him were clearly different.

      b.    As anxiety and depression are linked, his doctor also

temporarily increased the dose of his antidepressant by 50% to help cope with

this trauma, as she could see that it was a major struggle.

      c.    Furthermore, although Mr. Jones has not had insomnia for

five years since he was prescribed sleep medicine, for a whole week after his

mistreatment, Mr. Jones was only able to sleep a few hours a night, and that only

changed because his doctor increased his medication temporarily by 33% to try

and help with his insomnia.  He was worrying about his family's economic

situation, and the way his unjustly tainted work history might influence future

employment.

      d.    Despite his doctor prescribing a hefty dose of sleep

medicine, Mr. Jones had several nightmares that forcefully woke him up from

sleep in the month after his mistreatment.  The three most notable were: (1) a

scene where his two-year old son kept running away from him and he kept

saying, "I don't love you daddy, I don't love you"; (2) a scene where Mr. Jones

was lying face up on the ground, he couldn't breathe and he kept gasping for air,

and one of his best friends from high school and college was looking down at

him, pointing his finger and laughing at him, then he awoke, breathing heavily, and he had to use his rescue inhaler to get it somewhat under control; and (3) a scene of him reliving his humiliation and pain where he was confronted by three managers in front of the whole office.

      e.     Mr. Jones had episodes where he became dizzy and a little off balance, and four times while standing, Mr. Jones had to immediately find a place to sit down.  Mr. Jones has never had unexplained dizzy spells before.

      f.     For about two weeks after his mistreatment, Mr. Jones also experienced an unexplained muscle twitch in the right side of his neck.  This symptom started with the twitches very close to each other in an episode, but then, as time went on, they became further apart, eventually stopping about a month after the episodes began.

      g.     The termination has also stricken a blow to his educational endeavors, as he had been approved to take leave to attend a law school semester capstone week in Minnesota the week following the mistreatment.  Mr. Jones was feeling so ashamed, depressed, and humiliated, that he was completely scared of being alone for a week, and particularly driving in such an emotional and physical state for over 1,250 miles, from Friday night to Sunday morning. The Director of his law school program told him that he may have to redo his

whole law school semester for missing the week, and that she would have to ask

his professors to see if they would approve him from missing the capstone week.

Mr. Jones had to wait a whole ten days without knowing whether he would have

to redo a whole semester, and to make it worse, the Director had told him, "As

of now, I believe you will need to redo the semester, unless your professors

report back to me that they feel you have achieved well enough in the class so

far for your absence to not be a major problem with satisfactorily learning the

material."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FAILURE TO ACCOMMODATE UNDER THE ADA
### AND/OR REHABILITATION ACT

71.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 70 above as if alleged in full herein.

72.     Plaintiff was an employee with a disability and a qualified

individual with a disability.

73.     Plaintiff requested reasonable accommodations.

74.     The University of Utah failed to afford Plaintiff reasonable

accommodations in a timely or complete manner.

75.    The University of Utah, through the actions of Plaintiff's supervisors, violated Title 42, Chapter 126, Subchapter 1, Sections 12112, subjections (a) and (b)(5) of the ADA and ADAAA by failing to make reasonable accommodations to the known physical limitations of Mr. Jones, an individual with a disability, who was an employee.

76.    Furthermore, on information and belief, Mr. Jones alleges that, as the University of Utah maintains a contract of at least $10,000 with a federal entity, then the University is subject to the requirements of Section 504 of the Rehabilitation Act of 1973.

77.    Although accommodations based on the ADAAA is based on a "reasonable time frame," giving no exact definition, Section 504 of the Rehabilitation Act does speak to what a reasonable time frame is.  "Requests for reasonable accommodations must be processed within a reasonable period of time.  What constitutes a reasonable period will depend upon the specific circumstances.  However, in general, if supporting medical documentation is not needed, that timeframe should not be longer than five to 10 business days.  If supporting medical documentation is needed, or if special equipment must be ordered, that timeframe should not exceed 30 calendar days, unless there are extenuating circumstances beyond the control of the contractor".  (C.F.R. § Title 41, Subtitle B, Chapter 60 Part 60-741, Appendix B(8).)

45

78.     The requests made by Mr. Jones were simple and straightforward, and there was no need for medical documentation.  This is proven by the fact that the University of Utah did eventually, after significant delay, approve the accommodation request without documentation.  However, the accommodation was never implemented.  Neither was there special equipment needing to be ordered, as the item of accommodation was already being utilized by Plaintiff, and solely an adjustment to elevate the workstations table twelve inches higher was needed.  Mr. Jones alleges that, in accordance with Section 504, the reasonable accommodation was not processed within a reasonable period of time, as the timeframe listed for the processing of requests where medical documentation is not needed, should be no longer than five to 10 business days.  This standard was indisputably not met, as 19 business days had passed from the day the request for accommodation was received, and the day Mr. Jones was no longer employed by the University of Utah.  And to further demonstrate the request was not met, a total of 28 calendar days had passed from the day of the request for accommodation was received, and the day Mr. Jones was no longer employed by the University of Utah.  Clearly, if the time to process the accommodation request almost passed the 30-day reasonable time frame for requests which are complex and time-taking, such as ordering new equipment, then the simple request Mr. Jones initiated was not processed within a reasonable time frame.

46

79.    Likewise, the University of Utah has violated Section 11212 of the ADAAA, and Section 504 of the Rehabilitation Act of 1973, by failing to fulfill the requirement to make reasonable accommodations to the known physical or mental limitations of a qualified individual with a disability, and would surely fail to prove that the accommodation would impose an undue hardship on the operation of the business of such covered entity, as there are tens of individuals in the same sub-department of the organization, that were able to use the identical chair Mr. Jones requested, although he was the one who requested such a chair because of a disability. Providing the chair which Mr. Jones requested would not have constituted an undue hardship, because there were already so many employees in the same sub-department who enjoyed the chairs at issue.

80.    Therefore, the University of Utah, having violated Section 11212 of the ADAAA, and having failed to fulfill the reasonable timeframe requirement for reasonable accommodations through Section 504 of the Rehabilitation Act of 1973, is subject to damages to the fullest extent that pertinent laws allow.

## SECOND CAUSE OF ACTION
## DEFENDANT DISCRIMINATED AGAINST
## PLAINTIFF BECAUSE OF HIS DISABILITY

81.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 80 above as if alleged in full herein.

82.     In order to establish a claim of discrimination based on disability,

Plaintiff must allege facts which establish, or tend to establish, that: (1) he is disabled

in that he has an impairment which is substantially limiting in a major life activity; (2)

he was otherwise qualified in that he could perform the essential duties of the position

he held or desired, with or without reasonable accommodation; (3) Defendant

subjected him to an adverse action and; (4) the circumstances surrounding the adverse

action give rise to an inference of discrimination.  *Carter v. Pathfinder Energy Servs.,*

*Inc.,* 662 F.3d 1134, 1142 (10th Cir. 2011); *accord Zwygart v. Bd. of Cnty Comm'rs,*

483 F.3d 1086, 1090 (10th Cir. 2007).

83.     As set forth above, Plaintiff is a person with a disability.

84.     As set forth above, Plaintiff was qualified to perform the essential

duties of the position he held or desired, with or without an accommodation.

85.     In order to establish the third element of a prima facie case,

Plaintiff alleges that Defendant subjected him to an adverse employment action.

86.     Plaintiff alleges Defendant subjected him to an adverse

employment action.  An adverse employment action includes "significant change in

employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in

benefits".  *Piercy v. Maketa,* 480 F.3d 1192, 1203 (10th Cir. 2007) (*internal quotation*

*omitted*).  Plaintiff alleges Defendant took adverse action against him on March 23, 2017 when it terminated his employment.

87.     Plaintiff's allegations satisfy the third element of his prima facie case.

88.     To establish the fourth element of a prima facie case, Plaintiff alleges that the circumstances surrounding the adverse action give rise to an inference of discrimination.  Potential circumstances that support an inference of discrimination include, but are not limited to: (1) disparate treatment which but for the employee's protected trait would be different, *International Union v. Johnson Controls, Inc.,* 499 U.S. 187, 200 (1991); or (2) evidence that the protected trait actually motivated the employer's decision.  *Phillips v. Martin Marietta Corp,*. 400 U.S. 542, 544 (1971).

89.     Plaintiff alleges his disability and his effort to accommodate himself support an inference that Defendant wrongfully terminated his employment because of his disability.

90.     Plaintiff's allegations satisfy the fourth element of his prima facie case.

91.     Plaintiff's allegations state a prima facie claim of discrimination on the basis of disability.

## THIRD CAUSE OF ACTION
## DEFENDANT RETALIATED AGAINST PLAINTIFF

49

92.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 91 above as if alleged in full herein.

93.     In order to establish a claim of retaliation, Plaintiff must allege facts which establish, or tend to establish, that: (1) he engaged in protected opposition to discrimination; (2) contemporaneous with or subsequent to the protected activity, Defendant subjected him to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Argo v. Blue Cross and Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2414-15 (2006)).

94.     Plaintiff may establish the first element in several ways.  Plaintiff may establish the first element by alleging that he requested a reasonable accommodation.  *See Wehrley v. American. Fam. Mut Ins. Co.,* 513 F.App'x 733, 740 (10th Cir. 2013) (citing *Jones v. U.P.S., Inc.,* 502 F.34 1176, 1194 (10th Cir. 2007)).

95.     Plaintiff alleges that, in February and March 2017, he requested to be accommodated.

96.     Plaintiff's allegations satisfy the first element of his prima facie case.

97.     In order to establish the second element of a prima facie case, Plaintiff alleges that, after he engaged in protected activity, Defendant subjected him to

adverse employment actions.  The Supreme Court has set forth the standard to be used

in determining what constitutes an adverse employment action.  Specifically, the action

must be materially adverse to a reasonable employee or applicant.  The Supreme Court

explained that "materially adverse" means that the harm must be significant.  It also

explained that the determination must be made objectively, and thus must be measured

against how a "reasonable person" would feel or act, an employee must show that the

action "well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination".  However, the Supreme Court emphasized that whether any

given act constituted retaliation may depend upon the particular circumstances.

*Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).

98.    Plaintiff alleges that Defendant took adverse action against him on

March 23, 2017, when it terminated his employment.

99.    Plaintiff's allegations satisfy the second element of his prima facie

case.

100.    In order to establish the third element of a prima facie case,

Plaintiff alleges a causal connection between the protected activity and the adverse

action.  A "causal connection may be demonstrated by evidence of circumstances that

justify an inference of retaliatory motive, such as protected conduct closely followed by

an adverse action".  *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1258 (10th Cir.

51

2001) (quoting *Burrus v. United Tel. Co. of Kansas Inc.,* 683 F.2d 339, 343 (10th Cir.

1982)).  In the instant case, just a few days separated Plaintiff's request for an

accommodation and his termination.  This supports the inference that Defendant

suspended Plaintiff because of his requests for accommodation.

      101.   Plaintiff's allegations satisfy the third element of his prima facie

case.

      102.   Plaintiff's allegations state a prima facie claim of unlawful

retaliation.

## IV.  DAMAGES

      103.   Mr. Jones alleges Defendant's actions and inactions have caused

him various losses, injuries and other damages, including lost wages, lost benefits,

damages to his employability and emotional distress.

## PRAYER FOR RELIEF

      WHEREFORE, Plaintiff prays for judgment against Defendant and seeks

the following relief:

      1.   A declaration and judgment determining that the Defendant

         violated applicable laws and are, therefore, liable to Mr. Jones for

         damages equal to his lost wages, lost employment benefits, and

         other compensation which was denied or lost to Mr. Jones as a

result of the Defendant's violations of Title II of the ADA and the

Rehabilitation Act;

2.　　For prejudgment interest on his lost wages;

3.　　For Mr. Jones' reasonable attorneys' fees, and any other costs of

the action;

4.　　For post-judgment interest on all amounts awarded to Mr. Jones

herein accruing from the date of judgment to the date of

satisfaction of judgment awarded herein; and

5.　　For such other and further legal and equitable relief as this Court

deems appropriate under the circumstances.

DATED this 21st day of February, 2020.


　　　　　　　　　　　　　　*/s/ David J. Holdsworth*
　　　　　　　　　　　　　　David J. Holdsworth
　　　　　　　　　　　　　　*Attorney for Plaintiff*

53

VERIFICATION

Bjorn Jones, being first duly sworn, upon his oath, deposes and says that he is the Plaintiff in the above-entitled action, that he has read the foregoing COMPLAINT and understands the contents thereof, and the allegations made therein are true of his own knowledge, except as to those matters alleged on information and belief which he believes to be true.

_____

Bjorn Jones

SUBSCRIBED AND SWORN to before me, a Notary Public, this \_\_\_\_ day of February, 2020.

_____

NOTARY PUBLIC

MY COMMISSION EXPIRES:        RESIDING AT: _____

_____