IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BJORN JONES,<br><br>             Plaintiff,<br><br>     v.<br><br>UNIVERSITY OF UTAH,<br><br>             Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00116<br><br>Judge Clark Waddoups |

Before the court is Defendant University of Utah's motion for summary judgment. (ECF No. 17.) After considering the parties' briefing and argument, and considering the evidence submitted for and against the motion, and for the reasons set forth herein, the court grants summary judgment in the University's favor on each of Jones's claims.

## Factual Background

This case arises from Jones's employment, and ultimate termination, by the University. Jones was hired by the University's Department of Pediatrics as a Pediatric Specialty Scheduler on February 21, 2017. (Compl. at ¶ 9, ECF No. 3.)

Jones claims that he suffers from a rheumatological impairment called Ankylosing Spondylitis, an autoimmune disorder that causes him widespread inflammation in the joints and ligaments of the spine. (*Id*. at ¶ 4.) As a result of this condition, Jones claims that he often experiences significant back pain that substantially limits his ability to conduct major activities

of daily life such as buttoning buttons, putting on his belt, tying his shoes, holding his wife's hand, and carrying his young children. (*Id*. at ¶ 5.)

Shortly after he was hired, on February 24, 2017, Jones submitted a disability accommodation request to the University's Office of Equal Opportunity and Affirmative Action (OEO/AA), requesting that his workstation be raised twelve inches from its current level and that the University provide him with an ergonomic office chair to help alleviate his back pain. (*See* Compl. at ¶ 11, ECF No. 3; Investigation Report at 3, ECF No. 17-10.)

On March 2, 2017, Liz Prince, a Consultant in the University's OEO/AA at the time, sent a letter to Jones acknowledging receipt of Jones's disability accommodation request and informing Jones that, as part of the process of reviewing his request, he would need to ensure that his health care provider provided the University with verification of his medical condition and need for accommodations.[1] Attached to the letter was a letter that Prince sent to Jones's doctor requesting medical information to verify Jones's condition and need for the requested accommodations. (*See* ECF No. 17-2.) The letter requested that Jones's doctor provide the requested information to the University by March 16, 2017. (*See id*.)

On the same day, Prince sent Jones an email, asking him to provide her information on the specific chair model he was requesting. (*See* ECF No. 17-3.) Jones responded by requesting that the University provide him with an Amia Steelcase office chair, a chair he personally owned and believed would best alleviate his back pain. (*See id*.) He also informed Prince that he was

---

[1]     The March 2nd letter to Jones is referenced in the University's motion but is not attached as an exhibit. (*See* Mot. at 3-4 (¶¶ 4-6), ECF No. 17.) Jones, however, does not dispute that he received the letter; nor does he dispute the University's description of the content of the letter. Because the letter and its contents are not material to the court's decision, the court will assume that the letter was correctly described in the University's motion.

currently bringing his own Amia chair from home to use from work but claimed that it was difficult and painful for him to take the chair out of his car and put it back in when he needed to use it at home. (*See* ECF No. 17-4.)

After receiving Jones's request for an Amia Steelcase chair, Prince informed Jones that, because the chair was more expensive than most, the University would need to go through a medical evaluation process to verify Jones's need for the specific chair. (*See* ECF No. 17-3.) In response, Jones provided Prince with the name and contact information of his rheumatologist. (*See id*.)

On May 16, 2017, Jones emailed Prince to ask for an extension of the deadline to provide the University with his medical information. (*See* ECF No. 17-6.) Jones told Prince that his rheumatologist, who he had seen that day, told him that he needed to see an occupational therapist to complete the medical information form provided by the University. (*See id*.) Prince responded, telling Jones that an extension would be fine and that she would keep his request open. (*See id*.) She also requested that Jones keep her updated on his efforts to obtain the requested medical information. (*See id*.)

On the same day, Prince emailed Jones's supervisor, Anne Laveder, to provide her information about the chair Jones had requested and how to get Jones's desk raised. (*See* ECF No. 17-5.) Prince told Laveder that she could contact the University's Environmental Health and Safety Department to schedule an ergonomic assessment for Jones to get his desk raised. (*See id*.)

Laveder responded on March 20, 2017, telling Prince that she had submitted a request to the University's Real Estate Administration to have Jones's desk raised twelve inches. (*See id*.) (*See also* ECF No. 17-7.)

Two days later, on March 22, 2017, Jones decided to take matters into his own hands and attempted to raise the surface level of his desk himself rather than wait for someone from the University's Real Estate Administration to come and do it for him. (*See* Jones Dep. at 32:20-33:1; 34:9-36:24; 39:14-19, ECF No. 17-9.) While he was taking apart his desk,[2] Jones was approached by his team leader, Starlene Todd. What happened next is disputed by the parties.

According to Jones, Todd told him that she wished he had not tried to raise the desk on his own. (*See Id.* at 39:24-40:24.) Then Todd left and Laveder, Jones's supervisor, came over. (*Id*. at 41:17-21.) Jones claims that Laveder appeared out of nowhere and abruptly told him to stop working on his desk, startling him. (*Id*. at 41:22-43:23.) He claims he felt like he was "in elementary school again and . . . was being spoken to like a misbehaved child," and that his "body and mind began to respond as if they were threatened." (*Id*. at 44:4-12.) Jones says that he told Laveder, in that moment, that he felt like the University was taking too long to fulfill his accommodation request and that he "was just hurting too much to keep going without the accommodation." (*Id*. at 44:13-19.) Laveder responded by telling Jones that he should not be

---

[2]     In his opposition memorandum, Jones disputes the characterization that he "attempted to take apart his desk," claiming he only removed some screws that held the work surface of his desk together in order to raise it. (*See* Opp. at 8, ECF No. 19.) In his deposition, however, Jones did not dispute that he was taking apart his desk. (*See, e.g.*, Jones Dep. at 34:25-35:4, 35:10-18, 36:16-20, 39:14-19, ECF No. 17-9.) The dispute over how to characterize what Jones's did to his desk on March 22, 2017 is nothing more than a semantic difference between the parties and, regardless, is not material to the outcome of this motion.

making the adjustment to his desk himself and that it "was a safety hazard which violated OSHA standards." (*Id*. at 44:20-45:4.)

Jones claims that when Laveder appeared and told him to stop adjusting his desk, he became emotional and began to cry to the point where he could not speak. (*Id*. at 45:19-46:3.) Jones admits that he refused to move to another workstation or an elevated desk in the reception area of the facility where he worked because he did not feel like either option provided him the accommodation he needed and was in pain. (*Id*. at 46:4-19.) According to Jones, Laveder told him he could go home for the rest of the day and that she would have someone come and raise his desk. (*Id*. at 47:10-20.) Jones also claims that Laveder said, "We'll see you tomorrow." (*Id*. at 47:19-20.)

The University describes the incident differently. According to the University, Todd told Jones to stop taking apart his desk when she first encountered him and that Jones told her no. (ECF No. 17-10 at p. 6.) Todd then went to alert Laveder regarding what Jones was doing. (*Id*.) After alerting Laveder, Todd then returned to Jones's desk and again asked him to stop. (*Id*. at p. 7.) Todd claims that after she asked Jones to stop a second time, Jones responded in a threatening manner, stating, "If I don't do it today, I will not be coming in tomorrow." (*Id*.) Todd described Jones as sweating profusely and being very red in the face during the incident. (*Id*.) She claims she was concerned that he might hurt himself and asked again that Jones stop manipulating his desk, which he again refused to do. (*Id*.)

Shortly thereafter, Laveder came to Jones's desk and asked him to stop adjusting it, at which point Jones stopped. (*Id*. at pp. 6-7.) Laveder claims that Jones then became emotional and stated that the University did not care about his medical condition and that he had left two

previous jobs because his employer had not responded to this request for an accommodation in a timely manner. (*Id*. a p. 6.) He also began to speak loudly and in a threatening or accusatory manner, disturbing other employees. (*Id*. at 6-7, 9.) According to Laveder, Jones refused to continue working until his accommodation request was fulfilled. (*Id*.) Jones was then sent home for the day. (*Id*.)

Although many of the events that occurred on March 22, 2017 are in dispute, it is undisputed that the University terminated Jones's employment the following day. In a letter informing Jones of his termination, the University indicated that his probationary employment was being terminated for his "unauthorized dismantling of [his] work desk, which rendered [his] work area unusable, in addition to [his] disruptive behavior when asked to stop." (ECF No. 17-13.)

On February 24, 2020, Jones initiated the current action, asserting claims against the University under the Americans with Disability Act and Rehabilitation Act for failure to accommodate, discriminatory termination, and retaliation. (*See generally* Compl., ECF No. 3.)

The University now seeks summary judgment on each of those claims.

## Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## Analysis

The University seeks summary judgment on all three of Jones's causes of action, each of which assert a violation of the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 and Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 794.

As an initial matter, the University argues that Jones's ADA claims are barred by sovereign immunity under the Eleventh Amendment to the United States Constitution, citing the Supreme Court's decision in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). Jones's counsel conceded at oral argument that Jones's ADA claims were barred by the Eleventh Amendment.[3] Accordingly, the court will dismiss Jones's claims to the

---

[3]     Even if Jones had not conceded that his ADA claims were barred by sovereign immunity, the court would still dismiss Jones's ADA claims on the merits of the University's invocation of sovereign immunity. As the University correctly points out in its motion, the Supreme Court has held that Congress did not abrogate state sovereign immunity when it enacted Title I of the ADA, which regulates disability discrimination in the context of employment. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-74 (2001). Thus, the Eleventh Amendment bars claims against states seeking monetary damage for violations of Title I of the ADA. *Id.* at 360. *See also Frazier v. Simmons*, 254 F.3d 1247, 1253 (10th Cir. 2001) ("[A]fter the Court's decision in *Garrett*, a private individual cannot sue a state or state official in federal court for money damages under Title I of the Disabilities Act.").

In *Frazier v. Simmons*, however, the Tenth Circuit recognized that a private individual may circumvent the Eleventh Amendment's bar on claims against states for violations of Title I of the ADA by bringing a suit against a state official in his official capacity seeking prospective injunctive relief under the *Ex Parte Young* doctrine. 254 F.3d at 1253. Jones argued, in his opposition brief, that he should be permitted to maintain his ADA claims in this action to recover prospective injunctive relief under the reasoning set forth in *Frazier*.

extent they are being pursued under the ADA on the grounds that such claims are barred by

sovereign immunity.[4]

The University has not challenged, however, its ability to be sued under Section 504 of

the Rehabilitation Act.[5] Accordingly, the court will consider each of Jones's claims under the

Rehabilitation Act on their merits.

_____

As noted above, however, Jones's counsel wisely conceded at oral argument that Jones's ADA claims should be dismissed. The *Ex Parte Young* doctrine has no application in this case to allow Jones to pursue prospective injunctive relief under Title I of the ADA because Jones has brought his claims against the University, an arm of the state, rather than a state official. *See Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 495-96 (10th Cir. 1998) ("[The *Ex Parte Young* doctrine] has no application in suits against the States and their agencies, which are barred regardless of the relief sought.") (citation omitted). Thus, Jones's ADA claims against the University are barred by the Eleventh Amendment and will be dismissed.

[4] The Tenth Circuit has held that the Eleventh Amendment imposes a jurisdictional bar on the court's ability to consider claims subject to a state's sovereign immunity. *See Robinson v. Kansas*, 295 F.3d 1183, 1188 (10th Cir. 2002) ("The Eleventh Amendment issue challenges our subject matter jurisdiction . . . ."); *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1182 (10th Cir. 1998) *overruled on other grounds by Hill v. Kemp*, 475 F.3d 1236, 1259 (10th Cir. 2007) ("The Eleventh Amendment stands as a bar to federal jurisdiction over all of these claims . . . ."). *Cf. Dahl v. United States*, 319 F.3d 1226, 1229 (10th Cir. 2003) ("Sovereign immunity is jurisdictional in nature.") (citation omitted). Because sovereign immunity implicates the court's subject matter jurisdiction, it would be inappropriate to grant summary judgment on Jones's ADA claims on that basis. *See Thompson v. United States*, 291 F.2d 67, 68 (10th Cir. 1961) ("A motion for summary judgment lies whenever there is no genuine issue as to any material fact. It is not a substitute for a motion to dismiss for want of jurisdiction. If the court lacks jurisdiction it cannot render a judgment but must enter an order dismissing the action."). Accordingly, rather than granting summary judgment, the court will dismiss Jones's ADA claims for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

[5] It is well-settled that the University is an arm of the state of Utah and, therefore, subject to the protection of the Eleventh Amendment. *See Yung-Kai Lu v. Univ. of Utah*, 660 F. App'x 573, 577 (10th Cir. 2016) (citing *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574-75 (10th Cir. 1996)) ("[I]t is well-settled that the University of Utah is considered an 'arm of the state' entitled to Eleventh Amendment immunity . . . ."). Like claims brought against the University under the ADA, claims brought against the University under the Rehabilitation Act also implicate the Eleventh Amendment and, potentially, the court's subject matter jurisdiction. Although the court is typically required to address issues regarding its jurisdiction sua sponte, in the context of Eleventh-Amendment immunity, "it is not obligated to do so." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008). Because the University does not

### A.      Jones Has Not Shown a Denial of Reasonable Accommodations.

In his first cause of action, Jones claims that the University violated the Rehabilitation Act by failing to provide him with reasonable accommodations for his disability in a timely manner.

Section 504 of the Rehabilitation Act provides, in relevant part, that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). The Act also provides that the "standards used to determine whether [Section 504] has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under title I of the [ADA]." *Id* at § 794(d). Thus, the Tenth Circuit applies the same test for determining whether a defendant has failed to provide reasonable accommodations under the Rehabilitation Act as the test applied to accommodation claims under the ADA.

Specifically, to establish his claim for failure to accommodate under the Rehabilitation Act, Jones must show that (1) he is disabled, (2) he is "otherwise qualified," (3) he requested a "plausibly reasonable accommodation," and (4) the University "refused to accommodate [his] disability." *Aubrey v. Koppes*, 975 F.3d 995, 1004 n.4 & 1005 (10th Cir. 2020).

The University challenges only Jones's ability to prove the fourth element of his accommodations claim—that the University refused to provide him with the reasonable accommodations he requested. According to the University, its good faith engagement in an

---

contend that it is immune from Jones's Rehabilitation Act claims under the Eleventh Amendment, the court will exercise its discretion not to consider that issue sua sponte.

interactive process to determine what accommodations Jones needed precludes it from being held liable for failure to accommodate.

The Tenth Circuit has held that the Rehabilitation Act requires an employer who receives a request for an accommodation to engage in an interactive process with the employee. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010). "The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee" and "is typically an essential component of the process by which a reasonable accommodation can be determined." *Id*. (citation omitted). During the interactive process, it is generally reasonable for an employer to request medical information about a disabled employee's impairment. *See Rockefeller v. Abraham*, 23 F. App'x 893, 897 (10th Cir. 2001) (citing *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998).

Here, Jones requested two accommodations on February 24, 2017, shortly after he was hired by the University—(1) that his work station be raised twelve inches from its current level and (2) that he be provided a specific kind of ergonomic chair. The University acknowledged that it had received Jones's request on March 2, 2017 and informed Jones that it did not have sufficient information to evaluate his request and that his health care provider would need to provide information regarding his disability as part of the accommodation process. The University requested that the medical information needed to evaluate Jones's accommodation request be provided by March 16, 2017.

The University also requested that Jones provide the specifications for the ergonomic chair he was requesting. When Jones provided that information, the University noted that

because of the cost that would be required to obtain the chair, it needed to obtain medical verification that the chair was necessary.

Jones made efforts to obtain the medical information requested by the University by scheduling an appointment with his doctor but was unable to provide the information by the March 16th deadline requested by the University. Jones then requested that he be given an extension to provide his medical information, which the University willingly agreed to. No medical information was provided to the University, however, before Jones's employment was terminated on March 23, 2017.

Although Jones had not provided the medical information requested by the University, Liz Prince, in the University's Office of Equal Opportunity and Affirmative Action, contacted Jones's supervisor, Anne Laveder, on March 16, 2017 and informed her of Jones's accommodation requests. Prince also told Laveder that she could fulfill Jones's request to have his desk raised by twelve inches immediately, before the requested medical information was obtained. Two days later, on March 20, 2017, Laveder submitted a request to the University's real estate department to have the desk raised. That request, however, was not fulfilled before Jones's employment was terminated.

Jones does not dispute that the University engaged in an interactive process as required by law. Instead, he argues (1) that his need for an accommodation was so obvious that the interactive process engaged in by the University, including the University's request for medical records, was unnecessary and (2) that the University failed to provide him with the reasonable accommodations he requested in a timely manner.

In support of his contention that an interactive process was not necessary in this instance, Jones cites interpretive guidance from the E.E.O.C. that provides:

> In many instances, the appropriate reasonable accommodation may be so obvious to either or both the employer and the individual with a disability that it may not be necessary to proceed in this step-by-step fashion. For example, if an employee who uses a wheelchair requests that his or her desk be placed on blocks to elevate the desktop above the arms of the wheelchair and the employer complies, an appropriate accommodation has been requested, identified, and provided without either the employee or employer being aware of having engaged in any sort of "reasonable accommodation process."

29 C.F.R. § 1600, App. The same guidance, however, provides that "[w]hen the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." *Id*.

Jones has not provided any evidence, or authority, to show that his medical condition, or need for an accommodation, should have been so obvious to the University that it should have provided his requested accommodations immediately without any evaluation. Instead, Jones focuses in his briefing on the fact that the accommodations he requested were specific and would not have imposed a heavy burden on the University to provide. But the issue at hand was not how obvious Jones's requests were. Certainly the University understood, as soon as Jones's request was submitted, what Jones was asking for. The question here, instead, is whether Jones's condition and need for an accommodation was so obvious that the University acted in bad faith by asking for verification.

It is not controversial to understand that an employee confined to a wheelchair would need obvious accommodations that an employer should provide right away without waiting for

medical verification. But when a disability is not obvious simply by observing an employee requesting an accommodation, the law reasonably allows an employer to request information to verify the disability.

A paradigmatic example of a condition that causes a need for an accommodation that is not typically obvious to an employer is a condition that causes back pain. Indeed, the E.E.O.C. has used such an example, in its own guidance, to show when a request for medical documentation is appropriate:

> Example B: An accountant with no known disability asks for an ergonomic chair because she says she is having back pain. The employer asks the employee to provide documentation from her treating physician that: (1) describes the nature, severity, and duration of her impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits her ability to perform the activity or activities; and (2) substantiates why an ergonomic chair is needed.
>
> Here, the employee's possible disability and **need for reasonable accommodation** are not obvious. Therefore, if the employee fails to provide the requested documentation or if the documentation does not demonstrate the existence of a disability, the employer can refuse to provide the chair.

U.S. Equal Emp. Opportunity Comm'n, No. 915.002, Enforcement Guidance: Disability-Related Inquiries and Medical Examination of Employees under the Americans with Disabilities Act (ADA), (2000), 2000 WL 33407181 (emphasis in original).

The circumstances of this case are nearly identical to the example provided by the E.E.O.C. of a situation where a disability and need for accommodation are not obvious, and where an employer acts reasonably by requesting further documentation to verify that a requested accommodation is not necessary. The University did not act in bad faith by engaging

in an interactive process before granting Jones's requested accommodations, including by asking that Jones provide medical documentation of his disability and need for an accommodation.

Jones also argues that the University's delay in providing him accommodations was unreasonable and constituted a violation of the Rehabilitation Act.

It does not appear that the Tenth Circuit has ever held that an employer was liable for failure to accommodate as a result of delay in providing accommodations. In *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1262-63 (10th Cir. 2001), however, the court did recognize that other courts have concluded that delay in providing accommodations can constitute discrimination and set forth four factors to consider when evaluating whether a delay was unreasonable: (1) the length of the delay, (2) the reasons for the delay, (3) whether the employer has offered any alternative accommodations while evaluating a particular request, and (4) whether the employer has acted in good faith.

It is undisputed that Jones first submitted his request for accommodations on February 24, 2017 and that his employment was terminated on March 23, 2017. The time between his request for accommodation and ultimate termination was 27 days, a period of less than four weeks.

Jones cites no authority, and the court has found none, showing that sch a short period of delay in providing accommodations was unreasonable. Indeed, several other courts have held that longer periods of delay were not unreasonable as a matter of law. *See Selenke*, 248 F.3d at 1262 (citing cases).

Jones argues that, at least with respect to his request to have his desk raised, the accommodation was simple and should not have taken nearly a month to provide. While the

court agrees that it may have been possible for the University to raise Jones's desk in a timelier manner, when the totality of the circumstances are considered, including the reason for the delay, no reasonable juror could find that the University acted unreasonably by not raising Jones's desk earlier.

Jones's brief does not discuss the reasons for the delay in providing his requested accommodations, other than to assert that that the University's engagement in an interactive process was unnecessary. As discussed above, it was appropriate and reasonable for the University to request medical documentation to verify Jones's disability and need for accommodation. That information was never provided to the University and it was not unreasonable for the University to delay providing Jones his requested accommodations until such information was received. *See Templeton*, 162 F.3d at 619 ("[T]he employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation.").

Jones points to the fact that the University eventually decided that it would not require medical documentation before taking steps to raise Jones's desk, arguing that that determination could and should have been made earlier. But that determination was only made after Jones was unable to provide the medical documentation requested by the University by the initial March 16th deadline. The fact that raising Jones's desk may have cost less or been easier to provide did not preclude the University from, at least initially, requesting that Jones provide medical documentation before providing it. Jones's need for a raised desk was no more obvious to the University than an ergonomic chair. Thus, the University's voluntary decision to take steps to raise Jones's desk was not legally required. No reasonable jury could find that the University

unreasonably delayed raising Jones's desk, and thereby violated the Rehabilitation Act, by voluntarily taking steps to raise the desk before it was legally required to do so.

Jones also fails to discuss any alternative accommodations that were provided to him while his request was being evaluated. But the University did provide an alternative accommodation to Jones by allowing him to bring his own personal chair for use at work. Neither Jones nor the University claim that Jones was unable to fulfill all of his job duties with use of his own personal chair.

Moreover, after Jones began dismantling his desk, his supervisors offered to allow him to work at other workstations, including at an elevated desk in the facility's reception area, until his desk could be raised. Jones refused those offered accommodations, however, and was sent home. Jones may have had good reason to believe those alternative accommodations would not have been helpful, but that does not negate the fact that the University offered them to him and that he refused them. The University's effort to provide Jones with alternative accommodations while his primary requests were under consideration or in the process of being implemented supports the conclusion that the University did not unreasonably delay its accommodation of Jones.

Finally, there is no evidence in the record that the University failed to act in good faith with respect to accommodating Jones.

Having reviewed each of the factors set forth in *Selenke*, the court concludes that no reasonable juror could find that the University discriminated against Jones by delaying its efforts to provide his requested accommodations. Accordingly, the court will grant summary judgment, in favor of the University, on Jones's failure to accommodate claim.

**B.     Jones Has Not Shown that the Termination of his Employment was Caused by Discrimination.**

In his second cause of action, Jones claims that his termination by the University was the result of discrimination based on his disability.

Because Jones does not claim to have any direct evidence of discrimination by the University, the court must evaluate his claim under the *McDonnell-Douglas* burden shifting framework. *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).  Under the *McDonnell-Douglas* framework, Jones must first come forward with evidence to establish a prima facie case of discrimination by showing that "(1) he was a disabled person under the statute, (2) he was otherwise qualified for the job regardless of the disability, and (3) he was terminated from his employment because of the disability." *Id*.

If Jones has come forward with sufficient evidence to establish his prima facie case, then the burden shifts to the University to articulate a nondiscriminatory reason for terminating Jones's employment. *Id*. If that burden is met, the burden then shifts back to Jones to show that the University's stated reason for his termination was pretextual. *Id*.

Here, the University argues that it is entitled to summary judgment on Jones's discriminatory termination claim because Jones has not presented any evidence to show that discrimination was the cause of his being fired.

The court agrees. In order to establish his prima facie cause, Jones was required to come forward with at least some affirmative evidence from which a jury could infer that Jones's disability was the sole cause[6] of his termination. Courts have recognized that a variety of

---

[6]     In contrast to claims for discrimination brought under the ADA, which only requires evidence that a plaintiff's disability was a but-for cause of an adverse employment action, a

circumstances may give rise to an inference of discrimination, including (1) "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," (2) "preferential treatment given to employees outside the protected class," (3) "the systematic transfer of a discharged employee's duties to other employees," (4) "a pattern of recommending the plaintiff for positions for which she is not qualified [or is overqualified for]", and (5) "failure to surface plaintiff's name for positions for which she is well-qualified." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (citation omitted).

Here, Jones fails to point to any evidence in the record from which a reasonable jury could find that the University was motivated by discrimination against Jones because of his disability when it terminated Jones, let alone that discrimination was the sole cause of the University's decision. Indeed, in his opposition memorandum, Jones expressly indicated that he was not challenging "the University's attack on his second claim, except as to the issue of whether its reason for taking adverse action against Mr. Jones—misconduct—was pretextual." (*See* Opp. Mem. at 24, ECF No. 19.) At oral argument, Jones's counsel denied that Jones had conceded that he could not make out a prima facie case of employment discrimination, but when pressed on what evidence showed that discrimination based on Jones's disability was the cause of his termination, the University's delay in providing accommodations was the only evidence that Jones's counsel could point to.

As discussed above, the University's short delay in providing Jones his requested accommodations was not unreasonable. There is no evidence that the University's delay was

---

claim for discrimination under the Rehabilitation Act requires the plaintiff to prove that his disability was the "sole cause" of an adverse action. *Crane v. Utah Dep't of Corrections*, 15 F.4th 1296, 1313 (10th Cir. 2021).

caused by some hostility or indifference towards Jones because of his disability, or that the University was unwillingly to provide Jones with reasonable accommodations once the medical documentation it properly requested was provided. No reasonable jury could infer from the University's 27-day delay in providing Jones the specific accommodations he requested that Jones's disability was the sole cause of his termination.

While the court questions the wisdom of the reasons the University gave for Mr. Jones's termination, which are based on facts that are in dispute, the court need not consider whether the stated reasons were pretextual where Jones has failed to make a prima facie case of discrimination. Because Jones has presented no evidence from which a jury could find that he was terminated because of discrimination, the University is entitled to summary judgment on Jones's discriminatory termination claim.

### C. Jones Has Not Shown that his Termination was in Retaliation for his Engagement in a Protected Activity.

Finally, in his third cause of action, Jones claims that he was terminated by the University in retaliation for his engagement in a protected activity—his request for accommodations.

Because Jones has presented no direct evidence of retaliation by the University, his claim must be evaluated under the *McDonnell Douglas* framework. *See Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). To establish a prima facie case of retaliation, Jones must show (1) that he engaged in protected opposition to discrimination, (2) a reasonable employee would find the challenged action materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action. *Hampton*, 87 F.4th at 1999 (citation omitted).

By incorporating the ADA's retaliation provisions by reference, Section 504 of the Rehabilitation Act adopts the same definition of protected activity that is set forth in the ADA. *See Reinhardt*, 595 F.3d at 1132. Thus, to establish that he engaged in protected activity, Jones must show that he either (1) opposed an act or practice made unlawful by the Rehabilitation Act or (2) participated in a an action for enforcement of the Rehabilitation Act by "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" the Act. *Id*. (citing 42 U.S.C. § 12203(a)). The Tenth Circuit has also recognized that making a request for a reasonable accommodation is protected activity under the participation prong. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007) (citing *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1265 (10th Cir. 1999)).

The University does not dispute that Jones's request for accommodation constituted a protected activity or that his termination was a materially adverse employment action. It does contend, however, that Jones has failed to come forward with any evidence showing a causal link between his request for accommodation and his ultimate termination.

Jones argues that the close temporal proximity between his request for accommodation and his termination is sufficient to establish causation for purposes of his prima facie case. Moreover, he argues that his attempt to engage in self-help by raising his desk himself constituted protected activity, which led to his termination.

The court first addresses Jones's contention that his attempt to raise his desk himself constituted protected activity that can provide the basis for his retaliation claim. As an initial matter, Jones's claim that his attempt at "self-help" constituted protected activity appears nowhere in his complaint. The only protected activity alleged in Jones's complaint is his request

to be accommodated. (*See* Compl. at ¶ 95, ECF No. 3.)  Instead, this argument was raised for the first time in Jones's opposition to the University's motion for summary judgment. (*See* Opp. Mem. at 24-27, ECF No. 19.) Jones's failure to allege that his attempt at self-help constituted protected activity in his complaint, and his attempt to expand the scope of his complaint through his opposition memorandum, is sufficient reason to disregard Jones's new theory of retaliation for purposes of this motion.

Nevertheless, even if Jones had properly alleged that his attempt at self-help constituted a protected activity in his complaint, his claim would fail because his attempt to raise his desk himself does not constitute protected activity under established law.

In order for an action to qualify as "protected opposition an employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the [Rehabilitation Act]." *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (citations omitted).

Jones's attempt to alter the height of his desk does not constitute opposition to any unlawful action by the University. As discussed above, the University acted lawfully by engaging with Jones in an interactive process to verify his disability and need for accommodation. Moreover, at the time Jones attempted to adjust the height of his desk, the University had already submitted a work order to have the desk raised. There is no evidence that Jones communicated his objection to the University's approach to providing him with an accommodation before taking action to adjust his desk. Nor did he communicate to the University that he believed it was not complying with the law. Instead, he chose to take matters

into his own hand. Jones's attempt to engage in self-help, therefore, cannot constitute protected activity under the opposition prong.

Jones can also show that he engaged in protected activity by demonstrating that his actions constituted participation in an action to enforce the Rehabilitation Act, such as making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing. *See Reinhardt*, 595 F.3d at 1132. Jones has failed to cite any authority to show that engaging in self-help to implement an accommodation that the University was already in the process of providing constitutes participation in enforcement of the Rehabilitation Act. The court has also been unable to find any authority to support such a theory.

Jones's attempt to alter his desk is not analogous to the types of participation that the law recognizes as protected activity for purposes of the Rehabilitation Act. Accordingly, Jones's actions cannot constitute protected activity under the participation prong either.

Because Jones's attempt to raise the level of his desk does not constitute protected activity, Jones can only succeed on his retaliation claim by showing a causal link between his request for accommodations and his ultimate termination.

Jones points only to the temporal proximity between his request for accommodations and his termination to support his claim of a causal link. Jones is correct that temporal proximity alone may raise an inference of causation when "termination is *very closely* connected in time to the protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Thus, the Tenth Circuit has held that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation," *id*. (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) *overruled on other grounds by Ellis v. Univ.*

*of Kan. Med. Ctr.*, 163 F.3d 1186, 1194-95 (10th Cir. 1998)), while a "three-month period, standing alone, is insufficient to establish causation, *id*. (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). The time between Jones's request for accommodations and his termination—27 days—falls within the category of cases where temporal proximity alone may be sufficient to show a retaliatory motive.

The Tenth Circuit has also recognized, however, that "evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-1002 (10th Cir. 2011) (citations omitted).

While a relatively short amount of time passed between Jones's request for accommodations and termination, the intervening events between Jones's request and termination undermine any inference of retaliatory motive that could be drawn from temporal proximity alone.

First, as soon as Jones made his request for accommodations, the University took action to engage in an interactive process with Jones to verify his need for an accommodation and to fulfill his requests. At the time of Jones's termination, Jones's supervisor, Laveder, had already made a request to have the University's real estate department raise Jones's desk. The steps taken by the University to fulfill Jones's accommodation requests undermine any inference of a causal link between Jones's request for accommodation and his ultimate termination.

Second, Jones's attempt to raise the level of his desk occurred almost four weeks after his request for accommodations and one day before his termination. While the events that occurred

after Jones attempted to adjust his desk are in dispute, there is no dispute that Jones attempted to engage in self-help by raising his desk himself, an activity that the University apparently disapproved of. While, again, the court questions whether Jones's actions warranted his termination, they do constitute an intervening event that undermines any inference that the University terminated Jones solely[7] because he requested an accommodation.

Because Jones offers no other evidence that a retaliatory motive by the University caused his termination, Jones fails to make a prima facie case of retaliation and the University is entitled to summary judgment.

## Conclusion

For the reasons set forth herein, the court hereby DISMISSES Jones's ADA claims on the grounds that they are barred by the Eleventh Amendment and GRANTS summary judgment in favor of the University on each of Jones's Rehabilitation Act claims.

DATED this 9th day of January, 2024.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[7]     As discussed above, to succeed under the Rehabilitation Act, Jones must show that retaliation was the sole cause of his termination. *See Crane*, 15 F.4th at 1313. Thus, even if temporal proximity alone were enough to permit an inference that Jones's request for accommodations was part of the rationale for terminating Jones, intervening events undermine any inference that it was the *sole* cause.